IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELE GRANDON, | ) | Case No. 4:22-cv-1069 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Michele Grandon seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Grandon challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in determining that she did not satisfy the automatic disability criteria for Listings 12.05 and 12.06.  Grandon further argues that the ALJ's residual functional capacity ("RFC") finding that she could perform work at the light exertion level was unsupported by substantial evidence.

Because any error in the ALJ's Listings analysis was harmless and the ALJ otherwise applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the ALJ's final decision denying Grandon's applications for DIB and SSI be affirmed.

I.      **Procedural History**

Grandon applied for DIB on September 18, 2019.  (Tr. 174).[1]  Grandon alleged that she became disabled on August 18, 2009, due to: (i) a learning disability; (ii) a birth deformity in her left elbow; (iii) bulging discs; (iv) anxiety; and (v) migraine headaches.  (Tr. 174, 209).  The Social Security Administration denied Grandon's application initially and upon reconsideration.  (Tr. 76–91, 94–106).  Grandon additionally applied for SSI and requested an administrative hearing.  (Tr. 117, 181).

On March 16, 2021, ALJ Susan Smoot heard Grandon's case telephonically and denied her applications in a May 12, 2021 decision.  (Tr. 15–28, 34–75).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Grandon had the RFC to perform work at the light exertion level, except that:

> [Grandon] can never climb ladders, ropes, or scaffolds; occasion[a]lly climb ramps or stairs, stoop kneel, crouch, or crawl; frequently balance, or reach overhead, to the front, or laterally with her left upper extremity; she must avoid concentrated exposure to excessive noise; and should avoid all exposure to dangerous moving machinery, unprotected heights, and should not perform commercial driving.  She can perform simple, routine one-to-three step tasks in an environment free of fast-paced production requirements or strict production quotas, and which is relatively static with infrequent changes that are explained in advance and implemented gradually.  She can have occasional[] interaction with supervisors, coworkers, and the general public.

(Tr. 20).

II.     **Evidence**

A.      **Personal, Educational, and Vocational Evidence**

Grandon was born on August 18, 1991 and was 18 years old on the alleged onset date.  (Tr. 174).  Grandon completed high school in 2011, where she attended special education classes.  (Tr. 43–44, 210); *see also* (Tr. 429–519 (individualized education program ("IEP")

---

[1] The administrative transcript appears in ECF Doc. 6.

records)).  Grandon thereafter enrolled in a hospitality and horticulture program at the Mahoning

County Career and Technical Center, through which she obtained employment as a dish washer

at Bob Evans.  (Tr. 44, 61, 210).  Grandon worked in that capacity part-time (between 24 and 37

hours/week) from May 2013 to February 2019.  (Tr. 211, 531, 536).  The ALJ determined,

however, that Grandon had no past relevant work.  (Tr. 26).

### B.      Relevant Medical Evidence

Grandon focuses her challenge upon the ALJ's consideration of the evidence regarding

her cognitive and mental health impairments at Steps Three and Four of the sequential evaluation

process; thus, it is unnecessary to summarize the medical and non-medical evidence related to

her other impairments.  ECF Doc. 7 at 3 n.2.

Grandon was born preterm with congenital cerebral hemorrhage, necessitating postnatal

hospitalization with oxygen and medication to treat anemia and breathing difficulties.  (Tr. 268,

281, 429).  She experienced developmental delay: she was not able to fully walk or speak until

age four and she began kindergarten at age seven.  (Tr. 268–69).  She was enrolled in school as a

child with disability; she received speech therapy and special education services; and she was

later diagnosed with cognitive disability.[2]  (Tr. 269, 281, 429).  Her diagnosis was based on an

overall cognitive ability below the borderline classification, with full-scale IQ scores ranging

between 53 and 72.  (Tr. 281, 433).

In mid-2010, Grandon participated in a summer work program, performing tasks that

were simplistic and routine.  (Tr. 316).  Grandon was noted to maintain perfect attendance and to

be pleasant and cooperative.  *Id.*  Grandon was also noted, however, to have maturity, speed, and

---

[2] Cognitive disability was defined by the school psychologist as "[s]ignificantly below-average general
intellectual capability that exists along with deficits in adaptive behavior."  (Tr. 468).

quality issues.  *Id.*  The maturity issues consisted of "inappropriate conversations, child-like mannerisms, and being easily distracted."  *Id.*

In October 2010, Grandon's IEP was reevaluated.  (Tr. 274–303).  Up until then, Grandon attended all mainstream classes, with adapted requirements and modified tests, and her cumulative grade-point average was 3.388.  (Tr. 281, 446, 502, 507, 513, 517).  School Psychologist Nicholas Grenzig reported that Grandon's performance assessment scores were generally "well below average;" her social/emotional functioning scores were within the average range; her adaptive behavior composite score was "moderately low;" and her vocational aptitude scores were below average in six of eight areas tested.  (Tr. 284–86, 288–89, 291, 293–98).

Grenzig also noted that Grandon required "much more repetition and wait time" relative to her peers when she applied reasoning strategies to problems of age-appropriate complexity and when presented with open-ended options.  (Tr. 284).  Grandon also had difficulty sometimes understanding the "so what?" of a conversation; she was unable to read "subtle non-verbal cues;" and she required directions and instructions to be carefully stated, with querying to make sure she understood what the task required.  (Tr. 284, 293).  And with respect to Grandon's social/emotional functioning, Grenzig described Grandon as "personally organized and self-disciplined" and "reasonably competent in her relationships with others."  (Tr. 289).  Grenzig also noted, however, that Grandon was "less skilled" with decision-making and "may tend to be immature in her social relationships with peers."  *Id.*

Joann Jones, one of Grandon's teachers, stated that Grandon was a diligent note-taker, though she did so at a slower pace than most of her peers.  (Tr. 280, 312).  Jones stated that Grandon always completed her homework but struggled with tests and quizzes.  (Tr. 280)*.  Jones

also stated that Grandon would separate from her peers due to her social skills or lack thereof, preferring the company of adults. *Id.*

In mid-2011, Grandon completed her required academic coursework and expressed her desire to enroll in a hospitality and horticulture program. (Tr. 306). Grandon's postsecondary transition team indicated that Grandon: (i) had difficulty with auditory and language processing; (ii) had difficulty with reading and writing comprehension; (iii) lacked the ability to make decisions or problem solve; (iv) could not maintain social distance; (v) spoke too loudly; (vi) demonstrated anxiety and worry; (vii) overshared information when it was not appropriate; and (viii) avoided social situations with peers, preferring the company of adults. *Id.* Grandon participated in vocational courses through May 2012. *See* (Tr. 317–23).

On May 2, 2019, Ashraf Ahmed, MD, Grandon's primary care physician, diagnosed Grandon with anxiety and referred her to psychology/psychiatry services for anxiety and vertigo, for which she was separately receiving treatment. (Tr. 375); *see* (Tr. 577–88 (physical therapy treatment)); (Tr. 614–15, 642–43 (emergency room visits)); (Tr. 969–78 (neurology treatment)).

On August 19, 2019, Grandon visited CommQuest pursuant to Dr. Ahmed's referral. (Tr. 1103–04). On initial assessment, Grandon reported she had been experiencing anxiety and panic symptoms since November 2018, consisting of: (i) excessive worry; (ii) sleep disturbance; (iii) trembling/shaking; (iv) dizziness/lightheadedness; (v) fatigue; (vi) heart palpitation; (vii) chest discomfort; (viii) accelerated heart rate and shortness of breath; and (ix) nausea. (Tr. 1104). Grandon reported that her symptoms occurred once per week, and lasted two to three minutes. *Id*. She also reported that she worked at Bob Evans until February 2019, when her anxiety and panic attacks made it "too difficult to work." (Tr. 1107, 1112). Grandon's mental status exam results were remarkable for anxious mood. (Tr. 1108). She was diagnosed with

generalized anxiety and panic disorder and was recommended for counseling and medication treatment.  (Tr. 1112).

On August 26, 2019, Grandon began receiving counseling services from Lisa M. Hoffert, CT.  (Tr. 1165).  Grandon rated her symptoms at 5/10 in severity.  *Id.*  Grandon continued to report 5/10 severity during her December 9, 2019 follow-up.  (Tr. 1167).  Meanwhile, she reported to Dr. Ahmed that she had experienced a panic attack on December 1, 2019, though her mood was "improving with counseling."  (Tr. 1044, 1046, 1048).  And she reported to her neurologist that her migraines and dizziness symptoms had improved to the point that they occurred only once every three months.  (Tr. 1055–56).

On March 13, 2020, Grandon visited Marissa Ragon, CNP, for a psychiatric evaluation. (Tr. 1114).  Grandon reported that she experienced anxiety during social situations and when out in public.  *Id.*  She reported that bad weather was the primary trigger for her panic attacks and that she experienced panic symptoms if she was unaccompanied while out in public.  *Id.*  She further reported that she was "recently evaluated and diagnosed with autism spectrum disorder." *Id.*  He mental status exam results were unremarkable.  (Tr. 1116).  Grandon declined medication treatment, indicating that counseling was "effective enough at this time."  *Id.*

On January 4, 2021, Grandon returned to CommQuest for another mental health assessment.  (Tr. 1185–95).  Grandon reported that she started having crying spells on October 24, 2020.  (Tr. 1186).  She reported that she "needs to continue to work on talking to inanimate objects."  *Id.*  And she reported feeling increased stress because of Covid-19 and missing out on events.  *Id.*  Her mental status exam results were remarkable for anxious mood.  (Tr. 1193).  The attending clinical counselor, Richard S. Stein, LPCCS, diagnosed Grandon with generalized

anxiety disorder, panic disorder without agoraphobia, autistic disorder, and adjustment disorder in response to an identifiable stressor (the ongoing Covid-19 pandemic). (Tr. 1194).

Grandon also attended a counseling session with Stein. (Tr. 1170). Stein noted that Grandon was using distractions to manage her anxiety. (Tr. 1171). Grandon also reported that the severity of her anxiety symptoms had gone down to 3/10. (Tr. 1172).

### C. Relevant Opinion Evidence

#### 1. Consultative Examiner – Suzanne Beason-Hazen, PhD

In May 2009, Grandon was brought by her family to Suzanne Beason-Hazen, PhD, for a neuropsychological evaluation. (Tr. 268). Dr. Beason-Hazen found that Grandon was functioning in the borderline range of intelligence based on a prorated full IQ of 74, a verbal IQ of 71, and a performance IQ of 80. (Tr. 269). Dr. Beason-Hazen further found that Grandon exhibited impaired function in: (i) basic attention; (ii) executive function; (iii) visual spatial function; (iv) memory; (v) verbal fluency; (vi) verbal abstract reasoning; and (vii) information processing speed. (Tr. 271). Dr. Beason-Hazen concluded that Grandon therefore met the criteria for cognitive disorder not otherwise specified. (Tr. 272).

Dr. Beason-Hazen opined that, in light of Grandon's cognitive impairments and difficulty with social interaction, it was "unlikely that she will be able to succeed in a traditional vocational setting. Vocational rehab or evaluation for employment in a sheltered workshop setting may be appropriate." (Tr. 272).

#### 2. Consultative Examiner – J. Joseph Konieczny, PhD

On October 1, 2018, Grandon visited J. Joseph Konieczny, PhD, for a psychological evaluation. (Tr. 536). Grandon reported that she lived with her sister, her sister's boyfriend, and her sister's children. (Tr. 538). She reported working part-time (25 hours/week) as a dishwasher

at Bob Evans, which she had done for five years.  (Tr. 536).  She reported being regularly involved in church attendance and occasionally involved in social activities with friends.  (Tr. 538).  She reported that she could perform simple cooking tasks, do household chores, shop, and manage her own finances, though she did not hold a checking or savings account.  *Id.*  Grandon denied ever receiving vocational rehabilitation services or psychiatric treatment.  (Tr. 536–37).  She also denied depression symptoms or auditory hallucinations.  (Tr. 537).

On mental status exam, Grandon exhibited deficits in her ability to perform logical abstract thinking.  (Tr. 538).  She also exhibited "some" limitation in her awareness of rules and conformity and overall level of judgment.  *Id.*  Grandon's full-scale IQ was 71, placing her in the borderline range of intellectual functioning.  (Tr. 538–39).  Dr. Konieczny noted that Grandon's test results were consistent with the intellectual testing performed while she was in school.  *Id.*

Dr. Konieczny opined that Grandon would have: (i) "some limitations" in her ability to understand, remember, and carry out instructions; (ii) "some difficulty" in maintaining focus and persistence on multi-step tasks; (iii) "some diminished tolerance" for frustration and diminished coping skills which would impact her ability to respond to "severe" workplace supervision and interpersonal situations, though she remained capable of responding appropriately in "normal" situations; and (iv) "some diminished tolerance" for frustration and diminished coping which would impact her ability to respond to "severe" workplace pressure situations, though she could respond appropriately in "normal" situations.  (Tr. 539).  Dr. Konieczny further opined that Grandon appeared to require a "slight degree" of supervision and monitoring to manage her daily activities and financial affairs.  *Id.*

### 3.      Treating Source – Richard Stein, LPCC-S

On January 21, 2021, Clinical Counselor Stein completed a mental impairment questionnaire.  (Tr. 1152–55).  He stated that Grandon experienced anxiety and panic attacks related to bad weather, social situations, and being out in public places.  (Tr. 1152).  He stated that Grandon was being treated for her impairments with biweekly counseling sessions.  *Id.*

Stein checked boxes on the evaluation form to describe Grandon's mental functional limitations: (i) none to mild in the areas of understanding, remembering or applying information and in adapting or managing oneself; and (ii) marked in the area of interacting with others and maintaining concentration, persistence, or pace.  (Tr. 1154).  Stein further opined that Grandon's mental health impairments would cause her to be absent from work more than four days per month, based on her self-reports that she "miss[ed] work at her most recent job due to overwhelming feelings of anxiety/panic."  (Tr. 1154–55).

### 4.      State Agency Consultants

On January 3, 2020, Deryck Richardson, PhD, evaluated Grandon's mental capacity based on a review of the medical record.  (Tr. 85–87).  Dr. Richardson determined that there was insufficient evidence with which to evaluate the severity of Grandon's mental health impairments.  *Id.*

On July 24, 2020, Karen Terry, PhD, separately evaluated Grandon's mental capacity on reconsideration after receipt of new evidence.  (Tr. 99–100, 103–05).  Dr. Terry found that Grandon had only "moderate" limitations in each of the paragraph B areas of mental functioning.  (Tr. 99).  Dr. Terry opined that Grandon was capable of completing simple and routine 1-3 step tasks; tasks not requiring production pace or quotas; and relatively static job duties, with any

necessary changes made infrequently, adequately explained head of time, and implemented gradually.  (Tr. 104–05).

### D.    Letter of Support – Rachel Grandon

On March 10, 2021, Rachel Grandon ("Rachel"), Grandon's sister, wrote a letter in support of Grandon's disability claim describing her cognitive and mental health symptoms.  (Tr. 261–62).  According to Rachel, Grandon obsessed over: (i) the weather and fixated on extreme weather events despite the anxiety it gave her; (ii) car sounds (*i.e.*, engine noise, turn signal, and a door opening) and recorded herself taking pretend car trips, though she became too stressed when practicing driving a real car; (iii) cleaning and counting the number of spoons in a silverware drawer, becoming upset if any spoon was missing; (iv) her household running out of toilet paper; and (v) using the same route when going on walks to know the amount of time it would take to return home.  (Tr. 261).  Wednesday was Grandon's designated laundry day, for which she would get up at 5:30 a.m. to ensure her laundry was done on her day.  *Id.*  And Grandon used the restroom every 30 minutes out of concern that she would have an accident.  *Id.*  Grandon would sometimes become anxious and upset if her fixations/obsessions were interrupted.  *Id.*

Rachel stated that Grandon also had maturity and communications issues that inhibited her ability to form social connections with people outside her family.  (Tr. 261).  Rachel stated that Grandon struggled to comprehend jokes and sarcasm, and Rachel would often have to explain things as if to a child.  *Id.*  Rachel stated that Grandon had interests below her maturity level, such as programs and games for preschoolers, bodily noises, and talking to herself.  (Tr. 262).  And Rachel stated that Grandon was too naïve and trusting, giving as examples instances in which Grandon: (i) accepted her coworker's statements that she was fine and did not need to

go to the hospital despite suffering a workplace injury, unaware that she was even allowed to go; (ii) almost left the workplace with a stranger who invited Grandon to his house to play the piano and became upset when told of the potential dangers; (iii) divulged personal family information to a door-to-door missionary; (iv) exchanged phone numbers with a stranger, texted with him, and gave him her house address; and (v) accepted unlabeled medication from a coworker, which caused her to become ill.  *Id.*

Rachel also stated that Grandon could not complete simple tasks like filling out an application because she did not understand simple terms, such as "place of residence" or "maiden name."  *Id.*  Rachel stated that Grandon lacked the social skills to complete an interview, noting that Grandon once put in her two-week's notice to a job she had applied for before she had even received a call-back for an interview.  *Id.*  And Rachel stated that Grandon was unable to carry on a conversation with others and only knew how to talk about things in which she was interested.  *Id.*  Rachel further stated that Grandon volunteered at her local high school to sing the national anthem before sporting events and frequently attended church.  (Tr. 261).

### E.    Relevant Testimonial Evidence

Grandon testified at the administrative hearing consistent with Rachel's statements regarding: (i) her fixation with weather and severe weather events; (ii) pretend driving; and (iii) the spoon count in the silverware drawer.  (Tr. 55–56, 64–65).

Grandon testified that she felt overwhelmed while working at Bob Evans, in addition to being disrespected by coworkers.  (Tr. 61).  She was pulled aside various times by the district manager for not being able to keep pace with cleaning dishes.  (Tr. 62).  She stopped working at Bob Evans when she communicated to her supervisor that she was experiencing dizzy spells; he

11

told her not to come back until she learned what was going on.  (Tr. 47).  Grandon testified that it was later determined that her dizzy spells were caused by moderate to severe anxiety/panic attacks.[3]  (Tr. 53–54).  She did not take medication and instead managed her symptoms with deep breaths, playing piano, listening to a recorded truck engine, and pretend driving.  (Tr. 54).

Grandon testified that she sang and played piano for her school and church, singing the national anthem and leading hymns.  (Tr. 56–57).  Although she got nervous when performing, it would subside as the performance went on.  (Tr. 57–58).  She also attended in-person church services three days per week and two different churches, walking to each alone.  (Tr. 58, 68). She was not, however, an active participant at meetings and often did not understand what was being said.  (Tr. 68–69).

Grandon testified that she did some household chores, but only prepared microwave meals.  (Tr. 59–60).  Grandon could set a crockpot if Rachel wrote down directions with the steps she needed to take.  *Id.*  Grandon testified that Rachel would accompany her grocery shopping because Grandon was afraid she would get lost, be unable to return home, or that someone would reach into her purse.  (Tr. 66).  She could, however, travel short distances.  *Id.* Aside from her family, she only interacted socially over the internet.  (Tr. 66–67).

Vocational expert ("VE") Jerry Olsheski, PhD, testified that someone with the ALJ's hypothetical limitations could perform work at the light exertion level as a housekeeper, sorter, or hand packer.  (Tr. 69–72).  The VE testified the individual could also perform sedentary level work as an inspector, assembler, or address clerk.  (Tr. 72).  The VE testified that an employer would not tolerate more than 10% off-task behavior, more than one absence per month, or more

---

[3] A review of the medical record indicates that it was Grandon's subjective believe that her symptoms were related to her anxiety.  (Tr. 1056).  Her dizziness was instead suspected to be cardiac related.  (Tr. 923, 926, 958, 962, 967).

than two early departures or late arrivals per month.  (Tr. 73).  And the VE testified that an employer would not tolerate an individual who had to be redirected two to three times an hour after learning a job.  (Tr. 74).

### III.    Law & Analysis

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)).

## A.    Listings

Grandon argues that the ALJ misevaluated the evidence in making her Step Three findings.  ECF Doc. 7 at 12–13.  Grandon argues that contrary to the ALJ's decision, substantial evidence supported a finding that she met Listings 12.05B and 12.06.  *Id.*  Grandon argues that the evidence supported a finding of "marked" limitations in the paragraph B functional areas of adapting or managing herself and understanding, remembering, and applying information.[4]  ECF Doc. 7 at 13; ECF Doc. 9 at 1–2.  The Commissioner disagrees.  ECF Doc. 8 at 9–13.

At Step Three of the sequential evaluation process, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).[5]  If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e).  In evaluating whether a claimant meets or medically equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful review."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).  The ALJ "need not discuss [L]istings that the [claimant] clearly does not meet, especially when the claimant does not raise the [L]isting before the ALJ."  *Sheeks v. Comm'r of SSA*, 554 F. App'x 639, 641 (6th

---

[4] Imbued within Grandon's argument is a one-sentence statement challenging the ALJ's handling of the opinion evidence.  ECF Doc. 7 at 12.  However, Grandon has not articulated in what way the ALJ's analysis of the opinion evidence failed to comply with the regulations.  *See generally* ECF Doc. 7; ECF Doc. 9.  I therefore find any argument related to the ALJ's evaluation of the opinion evidence forfeited.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1989).

[5] Although this case concerns both DIB and SSI benefits, the regulations that govern them are nearly identical; thus, I will cite only to the regulations governing DIB applications.  *Compare* 20 C.F.R. § 404.1501 *et seq.*, *with* 20 C.F.R. § 416.901 *et seq.*

Cir. 2013).  "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a [L]isting, the ALJ should discuss that [L]isting." *Id.* at 641.

### 1.    Listing 12.06

Listing 12.06 establishes the automatic-disability criteria for anxiety and obsessive-compulsive disorders.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.06.  To meet Listing 12.06, the claimant must show that meets the criteria in paragraphs A and B.  *Id.*  Grandon only challenges the ALJ's evaluation of the functional limitations criteria in paragraph B.[6]  To meet paragraph B, the claimant must show that a mental health condition resulted in an extreme limitation in one, or marked limitations in two, of the following areas of mental functioning: (i) understand, remember or apply information; (ii) interact with others; (iii) concentrate, persist or maintain pace; and (iv) adapt or manage oneself.  *Id.* § 12.06B.

The severity of a limitation is measured on a five-point scale that evaluates the claimant's ability to function in each of these functional areas independently, appropriately, effectively, and on a sustained basis.  *Id.* § 12.00F2.  The five rating points are: (i) no limitation; (ii) mild limitation (slightly limited functioning); (iii) moderate limitation (fair functioning); (iv) marked limitation (seriously limited functioning); and (v) extreme limitation (no ability to function).  *Id.*  The existence of only moderate or mild limitations will not meet the paragraph B standard.

Grandon has not established a basis for remand on account of the ALJ's analysis of the Listing 12.06B criteria.  Grandon's argument is that the evidence supported different paragraph B findings than the ALJ determined.  But on judicial review our task isn't to determine whether the evidence establishes the severity requirement for paragraph B, but whether the ALJ's

---

[6] A claimant could alternatively meet Listing 12.06 by satisfying the criteria in paragraph C.  However, because Grandon has not challenged the ALJ's paragraph C finding, it is forfeited.  20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.00A2, 12.06; *Walp v. Saul*, No. 4:18cv897, 2019 U.S. Dist. LEXIS 137407, at *8 n.4 (N.D. Ohio Aug. 14, 2019); *see generally* ECF Doc. 7; ECF Doc. 9.

analysis was consistent with the regulations (which Grandon has not asserted) and whether her reasons for reaching the opposite conclusion were supported by substantial evidence. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Although I find that one of the ALJ's paragraph B findings met the regulatory standards, I also find another did not. However, because I conclude the error was harmless, I do not recommend remand on Grandon's Listing 12.06 challenge.

> In analyzing the first area of mental functioning, the ALJ reasoned:
>
> In understanding, remembering or applying information, [Grandon] has a moderate limitation. [Grandon's] records support that she completed a high school curriculum involving special education classes, and that her full-scale IQ has consistently been quantified just over 70. (Ex. 1F; 6F). Although this limits [Grandon's] ability to understand, remember, or apply information, she has been able to learn past jobs, and has not alleged lack of understanding as a barrier to learning job tasks. Her records support a moderate limitation in her abilities in this area of functioning.

(Tr. 19). Although brief and lacking in record citations, the ALJ's analysis complied with the requirement that she evaluate the evidence, compare it to the requirements of the paragraph B criteria, and explain the basis for her finding. *See Reynolds*, 424 F. App'x at 416. Substantial evidence supports the ALJ's finding that Grandon was able to complete a high school curriculum (Tr. 306); that she was able obtain and maintain employment for over five years in spite of her cognitive deficits (Tr. 61, 249); and that she did not assert a lack of understanding as a barrier to employment (*see* Tr. 536–37, 1107, 1190). *Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 U.S. Dist. LEXIS 244271, at *30 (N.D. Ohio Dec. 22, 2021) ("the regulations do not require the ALJ to prove a negative"). Elsewhere in her decision, the ALJ found persuasive parts of the opinion of Dr. Konieczny that Grandon had "some" limitations and Dr. Terry's opinion that Grandon had "moderate" limitations in this area of mental functioning. *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (it is proper to consider the ALJ's findings elsewhere in his decision to evaluate a challenge to his conclusions at Step Three); (Tr. 23, 25);

*see* (Tr. 99, 103–04, 539).  That was evidence from which a reasonable mind might accept as adequate to support the ALJ's finding of no more than "moderate" limitations.  *See Biestek*, 139 S. Ct. at 1154.

> In analyzing the fourth area of mental functioning, the ALJ reasoned:
>
> As for adapting or managing oneself, [Grandon] has experienced a moderate limitation.  [Rachel] described several situations in which [Grandon] lacked overall awareness in managing herself; however, the objective evidence shows only moderate mental health symptoms for which [Grandon] is not medicated, and which have not prevented her from obtaining past employment.  (Ex. 14E).

(Tr. 20).  The ALJ's analysis would appear at first glance to comply – barely – with the articulation requirements.  *Reynolds*, 424 F. App'x at 416.  But the ALJ did not explain the basis for, or cite any records to support, her determination that Grandon only experienced "moderate mental health symptoms."  In addition, Rachel Grandon's letter primarily addressed Grandon's cognitive deficits (obsessive fixation, maturity, and comprehension issues), for which the lack of medication treatment would arguably be irrelevant.  *E.g.*, *Gil v. Saul*, No. 8:19-CV-02512, 2021 U.S. Dist. LEXIS 63676, at *12–13 (C.D. Cal. Mar. 30, 2021); *Dickinson v. Saul*, No. 3:18-CV-00162, 2019 U.S. Dist. LEXIS 138457, at *23–24 (D. Idaho Aug. 13, 2019); *Easley v. Colvin*, 12-2466, 2015 U.S. Dist. LEXIS 36370, at *10 n.3 (W.D. Tenn. Mar. 24, 2015).  And Grandon's ability to *obtain* employment in 2013 would not necessarily address her ability to do so in 2021. *See Henrich v. Comm'r of Soc. Sec.*, 440 F. Supp.3d 699, 703 n.1 (E.D. Mich. 2020) ("In an application for SSI, the relevant period is the date of the application through the date of the ALJ's determination").  In short, the ALJ failed to build an accurate or logical bridge between the evidence and her conclusion that Grandon's impairments caused only "moderate" limitations in her ability to adapt or manage herself.  *Fleischer*, 774 F. Supp.2d at 877.

Nevertheless, the ALJ's articulation error was harmless.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  To meet the paragraph B criteria, Grandon had to show that her mental health impairments resulted in "extreme" limitations in one or "marked" limitations in two areas of mental functioning.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.06B.  Grandon has not argued that her impairments caused "extreme" limitations in any of the paragraph B functional areas.  *See generally* ECF Doc. 7; ECF Doc. 9.  As discussed above, substantial evidence supported the ALJ's finding of only "moderate" limitations in Grandon's ability to understand, remember, or apply information.  And Grandon has not contested the ALJ's finding that she had only "moderate" limitations in her ability to interact with others or concentrate, persist, or maintain pace.  *See generally* ECF Doc. 7; ECF Doc. 9.  Thus, even if we were to conclude that the ALJ should have found "marked" limitations Grandon's ability to adapt or manage herself, she would not meet the paragraph B criteria, because the regulations require a finding in of marked limitations in *two* functional domains, not one.

Moreover, a Step Three error can be harmless if it is apparent that even had the ALJ employed the proper analysis the ALJ would still have found the claimant not disabled.  *M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp.2d 846, 861 (E.D. Mich. 2011).  The question becomes whether we can say with confidence that a proper analysis would have resulted in a finding that Grandon did not have "extreme" limitations in her ability to adapt or manage herself.  *See id.*; 20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.06B.  And courts must be careful to avoid resolving conflicts in the evidence in the first instance or speculate as to how the ALJ might have resolved them.  *Rabbers*, 582 F.3d at 657; *Juarez v. Astrue*, No. 2:09-CV-160, 2010 U.S. Dist. LEXIS 18090, at *17 (E.D. Tenn. Feb. 8, 2010).

I can say with confidence that, had the ALJ employed the proper analysis, the ALJ would not have found "extreme" limitations in Grandon's ability to adapt or manage herself.  Both of the medical opinions the ALJ found persuasive found less than "extreme" limitations in this area of mental functioning.  (Tr. 99–100, 104, 539).  Dr. Konieczny further opined that despite Grandon's diminished tolerance for frustration and lack of coping skills, she was capable of responding appropriately in normal, non-severe workplace situations.  (Tr. 539).  Grandon's treating clinical counselor also opined that Grandon had no more than mild limitations in her ability to adapt or manage herself.  (Tr. 1154).  Grandon self-reported being able to perform simple cooking tasks, manage her personal hygiene, do household chores, shop, manage her own finances, and "comprehend instructions very well at work."  (Tr. 59–60, 532, 538, 1129).  Grandon denied having difficulty regulating her behavior.  (Tr. 537).  Grandon testified to being able to effectively manage anxiety when performing.  (Tr. 57–58).  And Grandon's treatment notes repeatedly reflected unremarkable appearance and behavior.  (Tr. 537, 1108–09, 1116, 1192).

That being said, Grandon's school records create a conflict in the evidence concerning Grandon's ability to adapt or manage herself.  School Psychologist Grenzig described Grandon as exhibiting immature mannerisms, responding to incorrect performance with frustration, failing to recognize incorrect work, and being unrealistic due to overoptimism.  (Tr. 281, 289).  In performing her summer job, she was noted to engage in inappropriate conversations, exhibit child-like mannerisms, and be easily distracted.  (Tr. 316).  And her postsecondary transition team stated that she was "weak" in decision-making and seeking help, lacked the ability to problem-solve, spoke too loudly, failed to maintain social distance, and overshared information.  (Tr. 306).  But we need not speculate as to how the ALJ would have resolved the conflict;

19

implicit in the ALJ's reasoning is that he weighed Grandon's ability to obtain and maintain employment for five years more heavily than the cognitive deficits described in her school records.  *See* (Tr. 19–20, 24); *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("we read the ALJ's decision as a whole and with common sense").

Thus, I find no basis for remand on account of the ALJ's analysis of the ALJ's analysis of Listing 12.06.

### 2.  Listing 12.05

Listing 12.05 establishes the automatic-disability criteria for intellectual disorder.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.05.  To meet Listing 12.05B,[7] the claimant must satisfy three criteria:

1. Significantly subaverage general intellectual functioning evidenced by a or b:

   a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

   b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

   a. Understand, remember, or apply information … ; or

   b. Interact with others … ; or

   c. Concentrate, persist, or maintain pace … ; or

   d. Adapt or manage oneself … ; and

---

[7] A claimant could alternatively meet Listing 12.05 by satisfying the criteria in paragraph A.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.05.  However, Grandon only argues that the evidence established the paragraph B criteria.  ECF Doc. 7 at 13; ECF Doc. 9 at 1–2.  Thus, I find any argument that she met Listing 12.05A forfeited.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.05B.

Grandon likewise has not established a basis for remand on account of the ALJ's failure to evaluate Listing 12.05B. As with Listing 12.06, Listing 12.05B requires a finding of "extreme" limitations in one or "marked" limitations in two of the paragraph B areas of mental functioning, of which Grandon only asserts she has "marked" limitations in the first and fourth areas of mental functioning. *Id.* § 12.05B, 12.06. The ALJ determined that Grandon's cognitive deficits did not cause more than "moderate" limitations in her ability to understand, remember, or apply information. (Tr. 19.) As discussed above, that finding was supported by substantial evidence. Because Grandon has not argued that her ability to adapt or manage herself was "extremely" impaired, the record does not raise a substantial question as to whether she met or equaled Listing 12.05B. *See Sheeks*, 544 F. App'x at 641–42; *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

Thus, Grandon has not established a basis for remand on account of the ALJ's failure to analyze Listing 12.05B. *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

**B.    RFC**

Grandon argues that the ALJ erred because substantial evidence supported a finding that she could not work on a regular and continuing basis, citing: (i) her postsecondary transition team's statement that "she would be unemployable without vocational services;" (ii) Dr. Suzanne Beason-Hazen's opinion that Grandon would be "unable to succeed in a traditional vocational

21

setting and that a sheltered workshop may be appropriate;" (iii) a remark on her summer work program performance that she needed additional work preparation and support to be competitively employed; (iv) Clinical Counselor Stein's opinion on her absenteeism; (v) Grandon's testimony that she was pulled aside at work for not being able to keep up; and (vi) the fact that she has never lived independently, obtained a driver's license, or managed her own finances.  ECF Doc. 7 at 14.

The Commissioner responds that substantial evidence supported the ALJ's finding that Grandon's subjective complaints were inconsistent with the objective medical evidence.  ECF Doc. 8 at 14–16.  The Commissioner argues Clinical Counselor Stein's opinion spoke to the ultimate issue of disability, which was reserved for the Commissioner.  ECF Doc. 8 at 14.

Grandon's reply brief argues that the ALJ should have found that her impairments would cause her to be off-task or absent beyond permitted tolerances.  ECF Doc. 9 at 2.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v.*

*Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016). If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

Grandon has not established a basis for remand on account of the ALJ's RFC determination. As with Grandon's Listings argument, her RFC argument asserts only that the evidence supported greater RFC restrictions than those found by the ALJ. But as stated above, the scope of our review is limited to two issues: (i) whether the ALJ's RFC analysis was consistent with the regulations (which Grandon has not contested) and whether the ALJ's reasons for reaching the opposite conclusion were supported by substantial evidence. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241 . Before addressing those issues, I note that Grandon's RFC argument rests partly on an inaccurate portrayal of the medical record. Her post-secondary transition team did not say that "she would be unemployable without vocational services." ECF Doc. 7 at 14 (citing Tr. 305–07). She was not placed in vocational services because "she was not capable of working competitively on her own." ECF Doc. 9 at 2 (citing Tr. 305–07, 316). And I was not able to find evidence in the record corroborating Grandon's assertion that she has "never been able to manage her own finances." *Cf.* (Tr. 538 ("[Grandon] performs her own shopping tasks and manages her own finances.")).

Grandon's RFC argument also rests partly on the opinions of Dr. Beason-Hazen and Clinical Counselor Stein. ECF Doc. 7 at 14 (citing Tr. 272, 1155). But the ALJ found those opinions unpersuasive, and Grandon has not offered any more than perfunctory argument that

those findings were result of a failure to apply proper legal standards or unsupported by substantial evidence.  *See McPherson*, 125 F.3d at 995–96.  The statements of Grandon's postsecondary team that she needed additional work prep and support to be competitively employed post-graduation would also not be relevant to Grandon's proposed findings of absenteeism or off-task behavior.  ECF Doc. 7 at 14 (citing Tr. 316); *see also* 20 C.F.R. § 404.1527(d)(1).

What's left is: (i) Grandon's slow performance during her summer work placement, lack of experience living independently, and failure to obtain a driver's license; and (ii) Grandon's subjective complaints that she was pulled aside for being unable to keep pace washing dishes, that she missed work at Bob Evans because of overwhelming feelings of anxiety/panic, and that she experienced anxiety, nausea, pressure, and crying spells while at work.  ECF Doc. 7 at 14 (citing Tr. 62); ECF Doc. 9 at 2–3 (citing Tr. 62, 305–07, 316, 1193–94).  This evidence goes largely to the severity of Grandon's claimed anxiety symptoms, which the ALJ rejected as not entirely consistent with the medical evidence.  (Tr. 21).  Although the ALJ did not articulate specific reasons for that determination, intertwined with the ALJ's discussion of the medical and nonmedical evidence were findings that would be inconsistent with Grandon's stated limitations.  *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  Such evidence included: (i) the lack of medication treatment for her anxiety/panic symptoms; (ii) Grandon's statement that she was doing "better overall" after commencing counseling; and (iii) Grandon's testimony that she regularly attended and performed at church functions.  (Tr. 21–24, 54, 56–58, 68, 1056); *see also* (Tr. 538, 1044, 1046, 1048, 1172).

Thus, I find no basis for remand on account of Grandon's RFC argument.

## IV.  Recommendation

Because Grandon was not prejudiced by the ALJ's Listings analysis and the ALJ otherwise applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Grandon's applications for DIB and SSI be affirmed.

Dated: December 12, 2022

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report & recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 301875, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).